**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,             )
                                      )
           Plaintiff,                 )
                                      )
      v.                              )    Civ. No. 07-
                                      )
THE DISTRICT OF COLUMBIA, et al.,     )
                                      )
           Defendants.                )
                                      )
_____   )

## JOINT MOTION FOR ENTRY OF SETTLEMENT AGREEMENT

Plaintiff United States and Defendants the District of
Columbia, et al., having entered into an Agreement concerning the
conditions of care and treatment at the St. Elizabeths Hospital,
jointly move this Court to enter the Proposed Settlement
Agreement as an Order of this Court in accordance with the terms
of the attached Proposed Order for Entry of Settlement Agreement.
The Parties agree that the provisions of the Settlement Agreement
represent a fair, adequate and reasonable resolution to this
lawsuit.

Respectfully submitted,

**FOR THE UNITED STATES:**


JEFFREY A. TAYLOR
United States Attorney
District of Columbia

WAN J. KIM
Assistant Attorney General
Civil Rights Division


RUDY CONTRERAS
Chief, Civil Division
United States Attorneys
   Office
District of Columbia

SHANETTA Y. CUTLAR
Chief
Special Litigation Section


JUDY C. PRESTON
Deputy Chief
Special Litigation Section


*William G. Maddox*
JE YON JUNG [495154]/
WILLIAM G. MADDOX [421564]
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 305-1457
(202) 514-0212 (fax)

**FOR THE DISTRICT OF COLUMBIA:**

*Ellen A. Efros* (by William C. Nadless
with permission)
ELLEN A. EFROS [250746]
Chief, Equity I Section
Office of the Attorney General
441 4th Street, N.W.
6th Floor
Washington, D.C. 20001
(202) 442-9886

## UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07- |
| | ) | |
| THE DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

### PROPOSED ORDER FOR ENTRY OF SETTLEMENT AGREEMENT

Plaintiff United States and Defendants District of Columbia, et al., have determined that a Settlement Agreement, rather than contested litigation, represents a fair, adequate and reasonable resolution to this lawsuit.

Having considered the parties' Joint Motion for Entry of Settlement Agreement, it is hereby ORDERED that Judgment shall be entered in this matter pursuant to the terms and conditions of the Settlement Agreement.  This Court will retain jurisdiction over the case in accordance with the terms of the Settlement Agreement.

DATED this _____ day of_____, 2007.


_____
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been

served by First-Class mail, postage prepaid to:

ELLEN A. EFROS
Chief, Equity 1 Section
Office of the Attorney General
441 4th Street, N.W.
6th Floor
Washington, D.C. 20001

on this ____11th____ day of May, 2007.


LAURIE WEINSTEIN
Assistant United States Attorney
555 Fourth Street, N.W.,
Room E4820
Washington, D.C.  20001
(202) 514-7133

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07- |
| | ) | |
| THE DISTRICT OF COLUMBIA, | ) | |
| Honorable Adrian M. Fenty, | ) | |
| Mayor, District of Columbia, | ) | |
| in his official capacity only; | ) | |
| DEPARTMENT OF MENTAL HEALTH, | ) | |
| Stephen T. Baron, Director, | ) | |
| Department of Mental Health, | ) | |
| in his official capacity only; | ) | |
| and SAINT ELIZABETHS HOSPITAL, | ) | |
| Patrick J. Canavan, | ) | |
| Chief Executive Officer, | ) | |
| Saint Elizabeths Hospital, | ) | |
| in his official capacity only, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

SETTLEMENT AGREEMENT

**TABLE OF CONTENTS**

I. General Provisions ............................................. 3

II. Definitions ................................................. 4

III. Compliance Officer ......................................... 5

IV. General Introduction ........................................ 6

V. Integrated Treatment Planning ............................... 7

VI. Mental Health Assessments .................................. 12

VII. Discharge Planning and Community Integration ............. 17

VIII. Specific Treatment Services .............................. 19

      A. Psychiatric Care ..................................... 19
      B. Psychological Care ................................... 22
      C. Pharmacy Services .................................... 25
      D. Nursing and Unit-Based Services ...................... 25

IX. Documentation .............................................. 27

X. Restraints, Seclusion, and Emergency Involuntary
    Psychotropic Medications ................................... 28

XI. Protection From Harm ....................................... 31

XII. Incident Management ........................................ 31

XIII. Quality Improvement ...................................... 35

XIV. Environmental Conditions .................................. 36

XV. Benchmarks................................................. 37

XVI. Terms and Conditions ...................................... 38

3

## I.    GENERAL PROVISIONS

A.    This Settlement Agreement(the "Agreement") is entered into between the United States and the District of Columbia; the District of Columbia Department of Mental Health; and Saint Elizabeths Hospital (collectively referred to as "the District").

B.    The Agreement resolves the investigation conducted by the United States Department of Justice ("United States") at Saint Elizabeths Hospital ("SEH") pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. The Agreement addresses the corrective measures set forth by the United States in its letter to the District dated May 23, 2006 ("Findings Letter"). This Agreement does not serve as an admission by the District that corrective measures are necessary to meet the constitutional and statutory rights of the residents of SEH.

C.    In conformity with CRIPA, this Agreement represents a voluntary effort by the District to meet the concerns raised by the United States' investigation. See 42 U.S.C. § 1997b (a)(2)(B) and § 1997g.

D.    Nothing in this Agreement shall be construed as an acknowledgment, an admission, or evidence of liability of the District under CRIPA, the Constitution, or federal or District law, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

E.    The signatures below of officials representing the United States and the District signify that these parties have given their final approval to this Agreement.

F.    This Agreement is enforceable only by the parties or the Court. This Agreement is binding upon the parties, by and through their officials, agents, employees, and successors. No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and,

4

accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement in any civil, criminal, or administrative action.  Similarly, this Agreement does not authorize, nor shall it be construed to authorize, access to District documents by persons or entities not a party to this Agreement.

G.    Since the United States issued the May 23, 2006 Findings Letter, the District has made progress in remedying the problems the United States identified in the Findings Letter.  The parties agree that it is in their mutual interests to avoid all litigation concerning the care and conditions of patients at SEH. The parties further agree that resolution of this matter pursuant to this Agreement is in the best interests of SEH's residents.

H.    All parties shall bear their own costs, including attorneys' fees, in this and any subsequent proceeding.

## II.    DEFINITIONS

A.    Effective Date

The Effective Date of this Agreement shall be the date that a corresponding order is entered by the District Judge for the United States District Court for the District of Columbia.  Unless otherwise specified, each provision of this Decree shall be implemented within one year of the Effective Date.

B.    Saint Elizabeths Hospital

SEH consists of all current buildings and facilities and any buildings and facilities constructed, renovated, and/or designated as part of SEH in the future.

C.    Incident

As required under Section XII of this Agreement, SEH
will identify categories and definitions of incidents
to be reported and investigated, and such categories
and definitions shall include, but not be limited to,
death, abuse, neglect, and serious injury.

## III. COMPLIANCE OFFICER

The District shall select, subject to the United States'
approval, a Compliance Officer to promote compliance with
and implementation of the provisions of this Settlement
Agreement.  The District shall pay the salary, costs, and
expenses associated with the Compliance Officer and, if
needed, shall provide sufficient funds to permit the
Compliance Officer to hire staff and consultants to assist
in carrying out the Compliance Officer's duties and
responsibilities under the Agreement.

The Compliance Officer shall serve as the liaison between
Saint Elizabeths Hospital, the District of Columbia, the
Department of Mental Health, and the United States
Department of Justice regarding compliance with this
Settlement Agreement.  The Compliance Officer's exclusive
duties are to oversee and promote implementation of the
provisions of the Agreement.

Specifically, the Compliance Officer's duties shall
include, but not be limited to:

1.    Monitoring and facilitating the District's compliance
      with each of the provisions in this Agreement;

2.    Preparing semi-annual reports for the parties
      regarding compliance with each of the provisions of
      the Agreement;

3.    Facilitating the organizing of and conducting formal
      meetings between the parties on a regular and periodic
      basis, at least quarterly, to update the parties
      regarding compliance with the Agreement, including
      areas of improvement and areas of concern; and

4.    Providing to the parties any relevant information
      known, or available to the Compliance Officer, under
      any provision of the Agreement upon reasonable
      request.

The Compliance Officer shall not be prohibited from
conducting ex parte communications with the Department of
Justice, Civil Rights Division, regarding any matter
related to this Agreement.

## IV.   GENERAL INTRODUCTION

A.    Care and treatment provided by SEH shall fully comply
      with the requirements of federal law, the United
      States Constitution, and consistent with generally
      accepted professional standards of care for the care
      and treatment of institutionalized persons and shall
      be designed to:

      1.    strengthen and support individuals'
            rehabilitation and recovery; and

      2.    enable individuals to grow and develop in ways
            benefiting their health and well-being.

B.    Care and treatment shall be accomplished while making
      efforts to maximize individuals' safety, security, and
      freedom from undue bodily restraint.   Staff
      interactions with individuals shall be therapeutic and
      respectful.

C.    Each individual served by SEH shall be encouraged to
      participate in identifying his or her treatment goals
      and in selecting appropriate treatment options.   Care
      and treatment shall be designed to address each
      individual's psychiatric treatment needs and to assist
      each individual in meeting his or her specific
      treatment goals, consistent with generally accepted
      professional standards of care.   SEH shall ensure
      clinical and administrative oversight of, education
      of, and support to, its staff in planning and
      providing care and treatment consistent with these
      standards.

7

## V.   INTEGRATED TREATMENT PLANNING

By 36 months from the Effective Date hereof, SEH shall
provide integrated individualized services, and treatments
(collectively "treatment") for the individuals it serves.
SEH shall establish and implement standards, policies, and
protocols and/or practices to provide that treatment
determinations are coordinated by an interdisciplinary team
through treatment planning and embodied in a single,
integrated plan.

A.   Interdisciplinary Teams

By 36 months from the Effective Date hereof, each
interdisciplinary team's membership shall be dictated
by the particular needs of the individual in the
team's care, and, at a minimum, the interdisciplinary
team for each individual shall:

1.   Have as its primary objective the provision of
individualized, integrated treatment and be
designed to discharge or outplace the individual
from SEH into the most appropriate, most
integrated setting without additional disability;

2.   be led by a treating psychiatrist or licensed
clinical psychologist who, at a minimum, shall:

a.   assume primary responsibility for the
individual's treatment;

b.   require that the patient and, with the
patient's permission, family or supportive
community members are active members of the
treatment team;

c.   require that each member of the team
participates in assessing the individual on
an ongoing basis and in developing,
monitoring, and, as necessary, revising
treatments;

8

    d.    require that the treatment team functions in an interdisciplinary fashion;

    e.    verify, in a documented manner, that psychiatric and behavioral treatments are properly integrated; and

    f.    require that the scheduling and coordination of assessments and team meetings, the drafting of integrated treatment plans, and the scheduling and coordination of necessary progress reviews occur.

3.    provide training on the development and implementation of interdisciplinary treatment plans, including the skills needed in the development of clinical formulations, needs, goals, interventions, discharge criteria, and all other requirements of section V.B., infra;

4.    consist of a stable core of members, including the resident, the treatment team leader, the treating psychiatrist, the nurse, and the social worker and, as the core team determines is clinically appropriate, other team members, who may include the patient's family, guardian, advocates, clinical psychologist, pharmacist, and other clinical staff; and

5.    meet every 30 days, during the first 60 days; thereafter every 60 days; and more frequently as clinically determined by the team leader.

B.    Integrated Treatment Plans

By 36 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols regarding the development of treatment plans to provide that:

1.    where possible, individuals have input into their treatment plans;

9

2.  treatment planning provides timely attention to
    the needs of each individual, in particular:

    a.  initial assessments are completed within 24
        hours of admission;

    b.  initial treatment plans are completed within
        5 days of admission; and

    c.  treatment plan updates are performed
        consistent with treatment plan meetings.

3.  individuals are informed of the purposes and
    major side effects of medication;

4.  each treatment plan specifically identifies the
    therapeutic means by which the treatment goals
    for the particular individual shall be addressed,
    monitored, reported, and documented;

5.  the medical director timely reviews high-risk
    situations, such as individuals requiring
    repeated use of seclusion and restraints;

6.  mechanisms are developed and implemented to
    ensure that all individuals adjudicated Not
    Guilty by Reason of Insanity ("NGRI") receive
    ongoing, timely, and adequate assessments by the
    treatment team to enable the courts to review
    effectively modifications in the individual's
    legal status;

7.  treatment and medication regimens are modified,
    as appropriate, considering factors such as the
    individual's response to treatment, significant
    developments in the individual's condition, and
    the individual's changing needs;

8.  an inter-unit transfer procedure is developed and
    implemented that specifies the format and content
    requirements of transfer assessments, including
    the mission of all units in the hospital; and

9.   to ensure compliance, a monitoring instrument is
     developed  to review the quality and timeliness
     of all assessments according to established
     indicators, including an evaluation of initial
     evaluations, progress notes, and transfer and
     discharge summaries, and a review by the
     physician peer review systems to address the
     process and content of assessments and
     reassessments, identify individual and group
     trends, and provide corrective follow-up action.
     This requirement specifically recognizes that
     peer review is not required for every patient
     chart.

C.   By 24 months from the Effective Date hereof, SEH shall
     establish policies and/or protocols to provide that
     treatment planning is based on case formulation for
     each individual based upon an integration of the
     discipline-specific assessments of the individual.
     Specifically, the case formulation shall:

     1.   be derived from analyses of the information
          gathered including diagnosis and differential
          diagnosis;

     2.   include a review of clinical history,
          predisposing, precipitating, and perpetuating
          factors, present status, and previous treatment
          history;

     3.   include a psychopharmacological plan of care that
          includes information on purpose of treatment,
          type of medication, rationale for its use, target
          behaviors, possible side effects, and targeted
          review dates to reassess the diagnosis and
          treatment in those cases where individuals fail
          to respond to repeated drug trials;

     4.   consider biochemical and psychosocial factors for
          each category in Section V.C.2., supra;

     5.   consider such factors as age, gender, culture,
          treatment adherence, and medication issues that

11

may affect the outcomes of treatment interventions;

6.    enable the treatment team to reach determinations about each individual's treatment needs; and

7.    make preliminary determinations as to the setting to which the individual should be discharged, and the changes that will be necessary to achieve discharge whenever possible.

D.    By 24 months from the Effective Date hereof, SEH shall establish policies and/or protocols to provide that treatment planning is driven by individualized factors.  Specifically, the treatment team shall:

1.    develop and prioritize reasonable and attainable goals/objectives (i.e., relevant to each individual's level of functioning) that build on the individual's strengths and address the individual's identified needs;

2.    provide that the goals/objectives address treatment (e.g., for a disease or disorder) and rehabilitation (e.g., skills/supports/quality of life activities);

3.    write the objectives in behavioral and measurable terms;

4.    provide that there are interventions that relate to each objective, specifying who will do what and within what time frame, to assist the individual to meet his/her goals as specified in the objective;

5.    design a program of interventions throughout the individual's day with a minimum of 20 hours of clinically appropriate treatment/rehabilitation per week; and

6.    provide that each treatment plan integrates and coordinates all selected services, supports, and treatments provided by or through SEH for the

individual in a manner specifically responsive to the plan's treatment and rehabilitative goals.

E.   By 24 months from the Effective Date hereof, SEH shall develop or revise treatment plans, as appropriate, to provide that planning is outcome-driven and based on the individual's progress, or lack thereof.  The treatment team shall:

1.   revise the objectives, as appropriate, to reflect the individual's changing needs;

2.   monitor, at least monthly, the goals, objectives, and interventions identified in the plan for effectiveness in producing the desired outcomes;

3.   review the goals, objectives, and interventions more frequently than monthly if there are clinically relevant changes in the individual's functional status or risk factors;

4.   provide that the review process includes an assessment of progress related to discharge; and

5.   base progress reviews and revision recommendations on clinical observations and data collected.

## VI.  MENTAL HEALTH ASSESSMENTS

By 18 months from the Effective Date hereof, SEH shall ensure that each individual shall receive, after admission to SEH, an assessment of the conditions responsible for the individual's admission.  To the degree possible given the obtainable information, the individual's treatment team shall be responsible, to the extent possible, for obtaining information concerning the past and present medical, nursing, psychiatric, and psychosocial factors bearing on the individual's condition, and, when necessary, for revising assessments and treatment plans in accordance with newly discovered information.

13

A.   Psychiatric Assessments and Diagnoses

   1.   By 24 months from the Effective date hereof, SEH
        shall develop and implement policies and
        procedures regarding the timeliness and content
        of initial psychiatric assessments and ongoing
        reassessments, including a plan of care that
        outlines specific strategies, with rationales,
        adjustments of medication regimens, if
        appropriate, and initiation of specific treatment
        interventions;

   2.   By 24 months from the Effective Date hereof, SEH
        shall develop an admission risk assessment
        procedure, with special precautions noted where
        relevant, that includes available information on
        the categories of risk (e.g., suicide, self-
        injurious behavior, violence, elopements,
        sexually predatory behavior, wandering, falls,
        etc.); whether the risk is recent and its degree
        and relevance to dangerousness; the reason
        hospital care is needed; and any mitigating
        factors and their relation to current risk;

   3.   By 12 months from the Effective Date hereof, SEH
        shall use the most current Diagnostics and
        Statistics Manual ("DSM") for reaching
        psychiatric diagnoses;

   4.   By 18 months from the Effective Date hereof, SEH
        shall ensure that psychiatric assessments are
        consistent with SEH's standard diagnostic
        protocols;

   5.   By 12 months from the Effective Date hereof, SEH
        shall ensure that, within 24 hours of an
        individual's admission to SEH, the individual
        receives an initial psychiatric assessment,
        consistent with SEH's protocols;

   6.   By 12 months from the Effective Date hereof, SEH
        shall ensure that:

14

a.    clinically supported, and current
      assessments and diagnoses are provided for
      each individual;

b.    all physician trainees completing
      psychiatric assessments are supervised by
      the attending psychiatrist.  In all cases,
      the psychiatrist must review the content of
      these assessments and write a note to
      accompany these assessments;

c.    differential diagnoses, "rule-out"
      diagnoses, and diagnoses listed as "NOS"
      ("Not Otherwise Specified") are addressed
      (with the recognition that NOS diagnosis may
      be appropriate in certain cases where they
      may not need to be justified after initial
      diagnosis); and

d.    each individual's psychiatric assessments,
      diagnoses, and medications are clinically
      justified.

7.    By 24 months from the Effective Date hereof, SEH
      shall develop protocols to ensure an ongoing and
      timely reassessment of the psychiatric and
      biopsychosocial causes of the individual's
      continued hospitalization.

B.    Psychological Assessments (these assessments may be
      completed by psychologists or graduate students in
      psychology under the supervision of psychologists.)

1.    By 24 months from the Effective Date hereof, SEH
      shall ensure that individuals referred for
      psychological assessment receive that assessment.
      These assessments may include diagnostic
      neuropsychological assessments, cognitive
      assessments, risk assessments and
      personality/differential diagnosis assessments,
      rehabilitation and habilitation interventions,
      behavioral assessments (including functional
      analysis of behavior in all settings), and
      personality assessments.

15

2. By 24 months from the Effective Date hereof, all psychological assessments, shall:

    a. expressly state the purpose(s) for which they are performed;

    b. be based on current, and accurate data;

    c. provide current assessment of risk for harm factors, if requested;

    d. include determinations specifically addressing the purpose(s) of the assessment; and

    e. include a summary of the empirical basis for all conclusions, where possible.

3. By 24 months from the Effective Date hereof, previously completed psychological assessments of individuals currently at SEH shall be reviewed by qualified clinicians and, if indicated, referred for additional psychological assessment.

4. By 24 months from the Effective Date hereof, appropriate psychological assessments shall be provided, whenever clinically determined by the team.

5. By 24 months from the Effective Date hereof, when an assessment is completed, SEH shall ensure that treating mental health clinicians communicate and interpret psychological assessment results to the treatment teams, along with the implications of those results for diagnosis and treatment.

16

C.    Rehabilitation Assessments

    1.    When requested by the treatment team leader, or
        otherwise requested by the treatment team, SEH
        shall perform a rehabilitation assessment,
        consistent with the requirements of this
        Settlement Agreement.  Any decision not to
        require a rehabilitation assessment shall be
        documented in the individual's record and contain
        a brief description of the reason(s) for the
        decision.

    2.    By 24 months from the Effective Date hereof, all
        rehabilitation assessments shall:

        a.    be accurate as to the individual's
            functional abilities;

        b.    identify the individual's life skills prior
            to, and over the course of, the mental
            illness or disorder;

        c.    identify the individual's observed and,
            separately, expressed interests, activities,
            and functional strengths and weaknesses; and

        d.    provide specific strategies to engage the
            individual in appropriate activities that he
            or she views as personally meaningful and
            productive.

    3.    By 24 months from the Effective Date hereof,
        rehabilitation assessments of all individuals
        currently residing at SEH who were admitted there
        before the Effective Date hereof shall be
        reviewed by qualified clinicians and, if
        indicated, referred for an updated rehabilitation
        assessment.

D.    Social History Assessments

    By 18 months from the Effective Date hereof, SEH shall
    ensure that each individual has a social history
    evaluation that is consistent with generally accepted

professional standards of care. This includes identifying factual inconsistencies among sources, resolving or attempting to resolve inconsistencies, explaining the rationale for the resolution offered, and reliably informing the individual's treatment team about the individual's relevant social factors.

## VII. DISCHARGE PLANNING AND COMMUNITY INTEGRATION

Taking into account the limitations of court-imposed confinement and public safety, SEH, in coordination and conjunction with the District of Columbia Department of Mental Health ("DMH") shall pursue the appropriate discharge of individuals to the most integrated, appropriate setting consistent with each person's needs and to which they can be reasonably accommodated, taking into account the resources available to the District and the needs of others with mental disabilities.

A. By 12 months from the Effective Date hereof, SEH, in conjunction and coordination with DMH, shall identify at admission and consider in treatment planning the particular factors for each individual bearing on discharge, including:

1. those factors that likely would result in successful discharge, including the individual's strengths, preferences, and personal goals;

2. the individual's symptoms of mental illness or psychiatric distress;

3. barriers preventing the specific individual from being discharged to a more integrated environment, especially difficulties raised in previous unsuccessful placements, to the extent that they are known; and

4. the skills necessary to live in a setting in which the individual may be placed.

B. By 12 months from the Effective Date hereof, SEH shall provide the opportunity, beginning at the time of admission and continuously throughout the individual's

stay, for the individual to be a participant in the
discharge planning process, as appropriate.

C.  By 12 months from the Effective Date hereof, SEH shall
ensure that each individual has a discharge plan that
is a fundamental component of the individual's
treatment plan and that includes:

  1.  measurable interventions regarding his or her
      particular discharge considerations;

  2.  the persons responsible for accomplishing the
      interventions; and

  3.  the time frames for completion of the
      interventions.

D.  By 12 months from the Effective Date hereof when
clinically indicated, SEH and/or DMH shall transition
individuals into the community where feasible in
accordance with the above considerations.  In
particular, SEH and/or DMH shall ensure that
individuals receive adequate assistance in
transitioning prior to discharge.

E.  Discharge planning shall not be concluded without the
referral of an individual to an appropriate set of
supports and services, the conveyance of information
necessary for discharge, the acceptance of the
individual for the services, and the discharge of the
individual.

F.  By 12 months from the Effective Date hereof, SEH
and/or DMH shall develop and implement a quality
assurance/improvement system to monitor the discharge
process and aftercare services, including:

  1.  developing a system of follow-up with community
      placements to determine if discharged individuals
      are receiving the care that was prescribed for
      them at discharge; and

  2.  hiring sufficient staff to implement these
      provisions with respect to discharge planning.

**VIII. SPECIFIC TREATMENT SERVICES**

    A.    Psychiatric Care

        By 24 months from the Effective Date hereof, SEH shall provide all of the individuals it serves routine and emergency psychiatric and mental health services.

        1.    By 24 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols regarding the provision of psychiatric care.  In particular, policies and/or protocols shall address physician practices regarding:

            a.    documentation of psychiatric assessments and ongoing reassessments per the requirements of this Settlement Agreement;

            b.    documentation of significant developments in the individual's clinical status and of appropriate psychiatric follow up;

            c.    timely and justifiable updates of diagnosis and treatment, as clinically appropriate;

            d.    documentation of analyses of risks and benefits of chosen treatment interventions;

            e.    assessment of, and attention to, high-risk behaviors (e.g., assaults, self-harm, falls) including appropriate and timely monitoring of individuals and interventions to reduce risks;

            f.    documentation of, and responses to, side effects of prescribed medications;

            g.    documentation of reasons for complex pharmacological treatment; and

            h.    timely review of the use of "pro re nata" or "as-needed" ("PRN") medications and

20

adjustment of regular treatment, as
indicated, based on such use.

2. By 18 months from the Effective Date hereof, SEH
shall develop and implement policies and/or
protocols to ensure system-wide monitoring of the
safety, effectiveness, and appropriateness of all
psychotropic medication use.  In particular,
policies and/or protocols shall address:

   a. monitoring of the use of psychotropic
      medications to ensure that they are:

      i. clinically justified;

      ii. prescribed in therapeutic amounts, and
         dictated by the needs of the
         individual;

      iii. tailored to each individual's clinical
          needs and symptoms;

      iv. meeting the objectives of the
         individual's treatment plan;

      v. evaluated for side effects; and

      vi. documented.

   b. monitoring mechanisms regarding medication
      use throughout the facility.  In this
      regard, SEH shall:

      i. develop, implement and update, as
         needed, a complete set of medication
         guidelines that address the medical
         benefits, risks, and laboratory studies
         needed for use of classes of
         medications in the formulary;

      ii. develop and implement a procedure
         governing the use of PRN medications
         that includes requirements for specific
         identification of the behaviors that

> result in PRN administration of medications, a time limit on PRN uses, documented rationale for the use of more than one medication on a PRN basis, and physician documentation to ensure timely critical review of the individual's response to PRN treatments and reevaluation of regular treatments as a result of PRN uses;
>
> iii. establish a system for the pharmacist to communicate drug alerts to the medical staff; and
>
> iv. provide information derived from Adverse Drug Reactions, Drug Utilization Evaluations, and Medication Variance Reports to the Pharmacy and Therapeutics, Therapeutics Review, and Mortality and Morbidity Committees.

3. By 36 months from the Effective Date hereof, SEH shall provide adequate levels of psychiatric staffing to ensure coverage by a full-time psychiatrist for not more than 12 individuals on the acute care units and no more than 24 individuals on the long-term units.

4. SEH shall ensure that individuals in need are provided with behavioral interventions and plans with proper integration of psychiatric and behavioral modalities. In this regard, SEH shall:

 a. ensure that psychiatrists review all proposed behavioral plans to determine that they are compatible with psychiatric formulations of the case;

 b. ensure regular exchanges of data between the psychiatrist and the psychologist; and

 c. integrate psychiatric and behavioral treatments.

5.   By 24 months from the Effective Date hereof, SEH shall review and ensure the appropriateness of the medication treatment.

6.   By 24 months from the Effective Date hereof, SEH shall ensure that individuals are screened and evaluated for substance abuse.

7.   By 24 months from the Effective Date hereof, SEH shall institute an appropriate system for the monitoring of individuals at risk for Tardive Dyskinesia ("TD"). SEH shall ensure that the psychiatrists integrate the results of these ratings in their assessments of the risks and benefits of drug treatments.

B.   Psychological Care

By 18 months from the Effective Date hereof, SEH shall provide adequate and appropriate psychological supports and services to individuals who require such services.

1.   By 18 months from the Effective Date hereof, SEH shall provide psychological supports and services adequate to treat the functional and behavioral needs of an individual including adequate behavioral plans and individual and group therapy appropriate to the demonstrated needs of the individual.  More particularly, SEH shall:

a.   ensure that psychologists adequately screen individuals for appropriateness of individualized behavior plans, particularly individuals who are subjected to frequent restrictive measures, individuals with a history of aggression and self-harm, treatment refractory individuals, and individuals on multiple medications;

b.   ensure that behavior plans contain a description of the maladaptive behavior, a functional analysis of the maladaptive

behavior and competitive adaptive behavior
that is to replace the maladaptive behavior,
documentation of which reinforcers for the
individual were chosen and what input the
individual had in their development, and the
system for earning reinforcement;

c.    ensure that behavioral interventions are the
least restrictive alternative and are based
on appropriate, positive behavioral
supports, not the use of aversive
contingencies;

d.    ensure that psychologists adequately screen
individuals for appropriateness of
individualized behavior plans, particularly
individuals who are subjected to frequent
restrictive measures, individuals with a
history of aggression and self-harm,
treatment refractory individuals, and
individuals on multiple medications;

e.    ensure that psychosocial, rehabilitative,
and behavioral interventions are monitored
appropriately and implemented appropriately;
and

f.    ensure an adequate number of psychologists
for each unit, where needed, with
experience in behavior management, to
provide adequate assessments and behavioral
treatment programs.

2.    By 18 months from the Effective Date hereof, SEH
shall provide adequate clinical oversight to
therapy groups to ensure that individuals are
assigned to groups that are appropriate to their
individual needs.

3.    By 18 months from the Effective Date hereof, SEH
shall provide adequate active psychosocial
rehabilitation sufficient to permit discharge
from SEH into the most integrated, appropriate
setting available.

4.   By 18 months from the Effective Date hereof, SEH shall ensure that:

    a.   behavioral interventions are based on positive reinforcements rather than the use of aversive contingencies, to the extent possible;

    b.   programs are developed and implemented for individuals suffering from both substance abuse and mental illness problems;

    c.   where appropriate, a community living plan is developed and implemented for individuals with cognitive impairment;

    d.   programs are developed and implemented for individuals with forensic status recognizing the role of the courts in the type and length of the commitment and monitoring of treatment;

    e.   psychosocial, rehabilitative, and behavioral interventions are monitored and revised as appropriate in light of significant developments, and the individual's progress, or the lack thereof;

    f.   clinically relevant information remains readily accessible; and

    g.   staff who have a role in implementing individual behavioral programs have received competency-based training on implementing the specific behavioral programs for which they are responsible, and quality assurance measures are in place for monitoring behavioral treatment interventions.

C.    Pharmacy Services

By 36 months from the Effective Date hereof, SEH shall provide adequate and appropriate pharmacy services consistent with generally accepted professional standards of care.  By 36 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols that require:

1.    pharmacists to complete reviews of each individual's medication regimen regularly, on at least a monthly basis, and, as appropriate, make recommendations to treatment teams about possible drug-to-drug interactions, side effects, medication changes, and needs for laboratory work and testing; and

2.    physicians to consider pharmacists' recommendations and clearly document their responses and actions taken.

D.    Nursing and Unit-based Services

SEH shall within 24 months provide nursing services that shall result in SEH's residents receiving individualized services, supports, and therapeutic interventions, consistent with their treatment plans. More particularly, SEH shall:

1.    Ensure that, before they work directly with individuals, all nursing and unit-based staff have completed successfully competency-based training regarding mental health diagnoses, related symptoms, psychotropic medications, identification of side effects of psychotropic medications, monitoring of symptoms and target variables, and documenting and reporting of the individuals' status;

2.    Ensure that nursing staff monitor, document, and report accurately and routinely individual's symptoms, actively participate in the treatment team process and provide feedback on individual's

responses, or lack thereof, to medication and behavioral interventions;

3.  Ensure that nursing staff monitor, document, and report routine vital signs and other medically necessary measurements (i.e., hydration, blood pressure, bowel sounds and movements, pulse, temperature, etc.), including particular attention to individuals returning from hospital and/or emergency room visits;

4.  Ensure that nursing staff document properly and monitor accurately the administration of medications;

5.  Ensure that, prior to assuming their duties and on a regular basis thereafter, all staff responsible for the administration of medication have completed successfully competency-based training on the completion of the Medication Administration Records;

6.  Ensure that all failures to properly sign the Medication Administration Record are treated as medication errors, and that appropriate follow-up occurs to prevent recurrence of such errors;

7.  Ensure that staff responsible for medication administration regularly ask individuals about side effects they may be experiencing and document responses;

8.  Ensure that staff monitor, document, and report the status of symptoms and target variables in a manner enabling treatment teams to assess individuals' status and to modify, as appropriate, the treatment plan;

9.  Ensure that each individual's treatment plan identifies:

    a.  the diagnoses, treatments, and interventions that nursing and other staff are to implement;

    b.    the related symptoms and target variables to be monitored by nursing and other unit staff; and

    c.    the frequency by which staff need to monitor such symptoms.

10.    Establish an effective infection control program to prevent the spread of infections or communicable diseases.  More specifically, SEH shall:

    a.    actively collect data with regard to infections and communicable diseases;

    b.    assess these data for trends;

    c.    initiate inquiries regarding problematic trends;

    d.    identify necessary corrective action;

    e.    monitor to ensure that appropriate remedies are achieved;

    f.    integrate this information into SEH's quality assurance review; and

    g.    ensure that nursing staff implement the infection control program.

11.    Ensure sufficient nursing staff to provide nursing care and services.

## IX.  DOCUMENTATION

By 24 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols setting forth clear standards regarding the content and timeliness of progress notes, transfer notes, and discharge notes, including, but not limited to, an expectation that such records include meaningful, accurate assessments of the

individual's progress relating to treatment plans and treatment goals.

X.   **RESTRAINTS, SECLUSION, AND EMERGENCY INVOLUNTARY PSYCHOTROPIC MEDICATIONS**

By 12 months from the Effective Date hereof, SEH shall ensure that restraints, seclusion, and emergency involuntary psychotropic medications are used consistent with federal law and the Constitution of the United States.

A.   By 12 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement policies and/or protocols regarding the use of seclusion, restraints, and emergency involuntary psychotropic medications that cover the following areas:

1.   the range of restrictive alternatives available to staff and a clear definition of each and that the use of prone restraints, prone containment and/or prone transportation is expressly prohibited.

2.   training in the management of the individual crisis cycle and the use of restrictive procedures; and

3.   the use of side rails on beds, including a plan:

a.   to minimize the use of side rails as restraints in a systematic and gradual way to ensure safety; and

b.   to provide that individualized treatment plans address the use of side rails for those who need them, including identification of the medical symptoms that warrant the use of side rails and plans to address the underlying causes of the medical symptoms.

B.   By 12 months from the Effective Date hereof, and absent exigent circumstances (i.e., when an individual

poses an imminent risk of injury to self or others),
SEH shall ensure that restraints and seclusion:

1.    are used after a hierarchy of less restrictive
      measures has been considered and documented;

2.    are not used in the absence of, or as an
      alternative to, active treatment, as punishment,
      or for the convenience of staff;

3.    are not used as part of a behavioral
      intervention; and

4.    are terminated as soon as the individual is no
      longer an imminent danger to self or others.

C.    By 12 months from the Effective Date hereof, SEH shall
      ensure that a physician's order for seclusion or
      restraint include:

1.    the specific behaviors requiring the
      procedure;

2.    the maximum duration of the order;

3.    behavioral criteria for release which, if met,
      require the individual's release even if the
      maximum duration of the initiating order has not
      expired;

4.    ensure that the individual's physician be
      promptly consulted regarding the restrictive
      intervention;

5.    ensure that at least every 30 minutes,
      individuals in seclusion or restraint must be re-
      informed of the behavioral criteria for their
      release from the restrictive intervention;

6.    ensure that immediately following an individual
      being placed in seclusion or restraint, there is
      a debriefing of the incident with the treatment
      team within one business day;

7.      comply with 42 C.F.R. Part 483, Subpart G,
        including assessments by a physician or licensed
        medical professional of any individual placed in
        seclusion or restraints; and

8.      ensure that any individual placed in seclusion or
        restraints is monitored by a staff person who has
        completed successfully competency-based training
        regarding implementation of seclusion and
        restraint policies and the use of less
        restrictive interventions.

D.  By 12 months from the Effective Date hereof, SEH shall
    ensure the accuracy of data regarding the use of
    restraints, seclusion, or emergency involuntary
    psychotropic medications.

E.  By 12 months from the Effective Date hereof, SEH shall
    develop, revise, as appropriate, and implement
    policies and/or protocols to require the review of,
    within three business days, individual treatment plans
    for any individuals placed in seclusion or restraints
    more than three times in any four-week period, and
    modification of treatment plans, as appropriate.

F.  By 12 months from the Effective Date hereof, SEH shall
    develop and implement policies and/or protocols
    regarding the use of emergency involuntary
    psychotropic medication for psychiatric purposes,
    requiring that:

1.      such medications are used on a time-limited,
        short-term basis and not as a substitute for
        adequate treatment of the underlying cause of the
        individual's distress;

2.      a physician assess the individual within one hour
        of the administration of the emergency
        involuntary psychotropic medication; and

3.      the individual's core treatment team conducts a
        review (within three business days) whenever
        three administrations of emergency involuntary
        psychotropic medication occur within a four-week

period, determines whether to modify the individual's treatment plan, and implements the revised plan, as appropriate.

G.  By 18 months from the Effective Date hereof, SEH shall ensure that all staff whose responsibilities include the implementation or assessment of seclusion, restraints, or emergency involuntary psychotropic medications successfully complete competency-based training regarding implementation of all such policies and the use of less restrictive interventions.

## XI.  PROTECTION FROM HARM

By 36 months from the Effective Date hereof, SEH shall provide the individuals it serves with a safe and humane environment, ensure that these individuals are protected from harm, and otherwise adhere to a commitment to not tolerate abuse or neglect of individuals, and require that staff investigate and report abuse or neglect of individuals in accordance with this Settlement Agreement and with District of Columbia statutes governing abuse and neglect.  SEH shall not tolerate any failure to report abuse or neglect.  Furthermore, before permitting a staff person to work directly with any individuals served by SEH, the Human Resources office or officials responsible for hiring shall investigate the criminal history and other relevant background factors of that staff person, whether full-time or part-time, temporary or permanent, or a person who volunteers on a regular basis.  Facility staff shall directly supervise volunteers for whom an investigation has not been completed when they are working directly with individuals living at the facility.

## XII.  INCIDENT MANAGEMENT

By 24 months from the Effective Date hereof, SEH shall develop and implement, across all settings, an integrated incident management system.  For purposes of this section, "incident" means death, serious injury, potentially lethal self harm, seclusion and restraint, abuse, neglect, and elopement.

32

A.   By 24 months from the Effective Date hereof, SEH shall
     develop, revise, as appropriate, and implement
     comprehensive, consistent incident management
     policies, procedures and practices.  Such policies
     and/or protocols, procedures, and practices shall
     require:

     1.   identification of the categories and definitions
          of incidents to be reported and investigated,
          including seclusion and restraint and elopements;

     2.   immediate reporting by staff to supervisory
          personnel and SEH's chief executive officer (or
          that official's designee) of serious incidents;
          and the prompt reporting by staff of all other
          unusual incidents, using standardized reporting
          across all settings;

     3.   mechanisms to ensure that, when serious credible
          allegations of abuse, neglect, and/or serious
          injury occur, staff take immediate and
          appropriate action to protect the individuals
          involved, including removing alleged perpetrators
          from direct contact with individuals pending the
          investigation's outcome;

     4.   adequate training for all staff on recognizing
          and reporting incidents;

     5.   notification of all staff when commencing
          employment and adequate training thereafter of
          their obligation to report incidents to SEH and
          District officials;

     6.   posting in each unit a brief and easily
          understood statement of how to report incidents;

     7.   procedures for referring incidents, as
          appropriate, to law enforcement; and

     8.   mechanisms to ensure that any staff person,
          resident, family member, or visitor who, in good
          faith, reports an allegation of abuse or neglect
          is not subject to retaliatory action by SEH

and/or the District, including but not limited to reprimands, discipline, harassment, threats, or censure, except for appropriate counseling, reprimands, or discipline because of an employee's failure to report an incident in an appropriate or timely manner.

B.   By 24 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement policies and/or protocols addressing the investigation of serious incidents, including elopements, suicides and suicide attempts, and abuse and neglect.  Such policies and procedures shall:

1.   require that such investigations be comprehensive, include consideration of staff's adherence to programmatic requirements, and be performed by independent investigators;

2.   require all staff involved in conducting investigations to complete successfully competency-based training on technical and programmatic investigation methodologies and documentation requirements necessary in mental health service settings;

3.   include a mechanism which will monitor the performance of staff charged with investigative responsibilities and provide technical assistance and training whenever necessary to ensure the thorough, competent, and timely completion of investigations of serious incidents; and

4.   include a reliable system to identify the need for, and monitor the implementation of, appropriate corrective and preventative actions addressing problems identified as s result of investigations.

C.   By 24 months from the Effective Date hereof, whenever remedial or programmatic action is necessary to correct a reported incident or prevent re-occurrence, SEH shall implement such action promptly and track and document such actions and the corresponding outcomes.

D.   By 24 months from the Effective Date hereof, records
     of the results of every investigation of abuse,
     neglect, and serious injury shall be maintained in a
     manner that permits investigators and other
     appropriate personnel to easily access every
     investigation involving a particular staff member or
     resident.

E.   By 24 months from the Effective Date hereof, SEH shall
     have a system to allow the tracking and trending of
     incidents and results of actions taken.  Such a system
     shall:

     1.   Track trends by at least the following
          categories:

          a.   type of incident;

          b.   staff involved and staff present;

          c.   individuals involved and witnesses
               identified;

          d.   location of incident;

          e.   date and time of incident;

          f.   cause(s) of incident; and

          g.   actions taken.

     2.   Develop and implement thresholds for injury/event
          indicators, including seclusion and restraint,
          that will initiate review at both the
          unit/treatment team level and at the appropriate
          supervisory level, and that will be documented in
          the individual's medical record with explanations
          given for changing/not changing the individual's
          current treatment regimen.

     3.   Develop and implement policies and procedures on
          the close monitoring of individuals assessed to
          be at risk, including those at risk of suicide,

that clearly delineate: who is responsible for such assessments, monitoring, and follow-up; the requisite obligations to consult with other staff and/or arrange for a second opinion; and how each step in the process should be documented in the individual's medical record.

## XIII. QUALITY IMPROVEMENT

By 36 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement quality improvement mechanisms that provide for effective monitoring, reporting, and corrective action, where indicated, to include compliance with this Settlement Agreement.

A.   Track data, with sufficient particularity for actionable indicators and targets identified in this Agreement, to identify trends and outcomes being achieved.

B.   Analyze data regularly and, whenever appropriate, require the development and implementation of corrective action plans to address problems identified through the quality improvement process.  Such plans shall identify:

   1.   the action steps recommended to remedy and/or prevent the reoccurrence of problems;

   2.   the anticipated outcome of each step; and

   3.   the person(s) responsible and the time frame anticipated for each action step.

C.   Provide that corrective action plans are implemented and achieve the outcomes identified in the Agreement by:

   1.   disseminating corrective action plans to all persons responsible for their implementation;

   2.   monitoring and documenting the outcomes achieved; and

3.    modifying corrective action plans, as necessary.

D.    Utilize, on an ongoing basis, appropriate performance
improvement mechanisms to achieve SEH's
quality/performance goals, including identified
outcomes.

## XIV.  ENVIRONMENTAL CONDITIONS

By 36 months of the Effective Date hereof, SEH shall
develop and implement a system to regularly review all
units and areas of the hospital to which residents have
access to identify any potential environmental safety
hazards and to develop and implement a plan to remedy any
identified issues, including the following:

A.    By 36 months from the Effective Date hereof, SEH shall
attempt to identify potential suicide hazards (e.g.,
seclusion rooms and bathrooms) and expediently correct
them.

B.    By 36 months from the Effective Date hereof, SEH shall
develop and implement policies and procedures
consistent with generally accepted professional
standards of care to provide for appropriate screening
for contraband.

C.    By 24 months from the Effective Date hereof, SEH shall
provide sufficient professional and direct care staff
to adequately supervise individuals, particularly on
the outdoor smoking porches, prevent elopements, and
otherwise provide individuals with a safe environment
and adequately protect them from harm.

D.    By 36 months from the Effective Date hereof, SEH shall
ensure that the elevators are fully repaired.  If
possible, non-ambulatory individuals should be housed
in first floor levels of living units.  All elevators
shall be inspected by the relevant local authorities.

E.    By 12 months from the Effective Date hereof, SEH shall
review and update the hospital fire safety and

evacuation plan for all buildings and ensure that the plan is approved by the local fire authority.

F.    By 36 months from the Effective Date hereof, SEH shall develop and implement procedures to timely identify, remove and/or repair environmentally hazardous and unsanitary conditions in all living units and kitchen areas.

## XV.    BENCHMARKS

By December 31, 2007, the District agrees to make substantial improvement in the following four (4) areas of this Settlement Agreement listed below.  Every four months beginning with the Effective Date of this Agreement, the District shall submit to the United States a Corrective Action Plan ("CAP") to achieve substantial improvement. The CAP shall list the particular provision of the Agreement being addressed, the action steps to be taken to adequately comply with the provision, the timeline to achieve the action steps, the person(s) responsible for implementing the action steps, the status of the action steps along with quality assurance mechanisms to evaluate and monitor such status, and the documents that demonstrate progress and/or compliance with the particular provision. If the District fails to comply with the below benchmarks, the United States may assert all its remedies available under law.

A.    Integrated Treatment Planning and its provisions under Section V of the Agreement.

B.    Mental Health Assessments and its provisions under Section VI of the Agreement.

C.    Incident Management System and its provisions under Section XII of the Agreement.

D.    Restraints, Seclusion, and Emergency Involuntary Psychotropic Medications and its provisions under Section X of the Agreement.

## XVI. TERMS AND CONDITIONS

A.  The District represents that it will periodically
    refine and revise the policies and/or protocols
    outlined in this Agreement to ensure compliance with
    the intent of this Agreement.  The District shall
    notify the United States regarding any substantive
    revisions to a policy and or protocol outlined under
    this Agreement.  Upon request by the United States,
    the District shall provide the United States with
    copies and an opportunity to provide substantive
    comment upon any policies and/or protocols revised
    pursuant to this Agreement.  If it wishes to provide
    substantive comments, the United States will provide
    such comments or request for additional time within 45
    days of receipt of the revisions.

B.  The District represents that it has educated, or will
    educate, all employees at SEH with respect to the
    policies and/or protocols outlined in this Agreement.

C.  The District shall maintain records to document its
    compliance with all terms and conditions of this
    Agreement.  The District shall also maintain any and
    all records required by, or developed pursuant to,
    this Agreement.

D.  Until this matter is dismissed, the United States
    shall have unrestricted access to, and shall, upon
    request, receive copies of any documents, records, and
    information relating to the implementation of this
    Agreement.  SEH shall provide any requested documents,
    records, and information to the United States as soon
    as possible, but no later than within 30 business days
    of the request.  The United States shall have
    reasonable access to all of SEH's buildings and
    facilities, including any newly constructed, renovated
    and/or designated buildings and facilities; staff and
    residents, including private interviews with staff,
    and, where clinically appropriate, private interviews
    with residents; and resident records, documentation,
    and information relating to the issues addressed in
    this Agreement.  SEH shall make all employees
    available so that they may choose to cooperate fully

with the United States.  The United States agrees to provide SEH with reasonable notice of any visit or inspection, although the United States and SEH agree that no notice shall be required in an emergency situation where the life, immediate health, or immediate safety of individual(s) is at issue. Nothing in this Agreement shall abridge the whistleblower rights of District employees or contractors under law.

E.    The District shall notify the DOJ immediately upon the death of any SEH's patient (excluding those patients on conditional release) and/or any situation resulting in such patient being placed in imminent and/or immediate jeopardy that has caused or may cause severe injury to such SEH patient.  The District shall forward to DOJ copies of any completed incident reports related to deaths, autopsies and/or death summaries of residents, as well as all final reports of investigations of those incidents described in this subsection.

F.    If SEH closes and individuals are moved to another facility or facilities, the United States reserves the right to evaluate the appropriateness of such placements.  If the District contracts for any of the services to be delivered at SEH which are covered under this Agreement, the Agreement shall be fully applicable to, and binding upon, any contracted services.

G.    If the United States maintains that the District has failed to carry out any requirement of this Agreement, the United States shall notify the District of any instance(s) in which it maintains that the District has failed to carry out the requirements of this Agreement.

H.    With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of a resident(s) at SEH, the District shall take substantial steps to correct the claim of non-compliance within 90 days of any notice of non-compliance.  During this period, the United

States and the District shall coordinate and discuss areas of disagreement and attempt to resolve outstanding differences.  If the United States and the District fail to reach an agreement, the United States is not limited in any fashion in pursuing its law enforcement obligations with 30 days notice, including any adverse litigation against the District and/or seeking appropriate enforcement of any provision of this Agreement.

I.   The District shall submit to the United States a status report every 6 months that discusses the current status of each provision of the Settlement Agreement along with a projection of the completion date for each provision and steps needed to be taken achieve such completion date.

J.   If, at any time, any party to this Agreement desires to modify it for any reason, that party will notify the other party in writing of the proposed modification and the reasons therefor.  No modification will occur unless there is a written agreement between the United States and the District. The mutually agreed upon modification must be approved by the Court.

K.   The Court will have continuing jurisdiction over enforcement of this Agreement for a period of five years from the effective date hereof.  If the District is able to reach sustained compliance with certain Sections of the Agreement for a period of two years, the United States will no longer monitor or require evaluation of such Sections.  If the parties agree that the District is in sustained compliance with each of the provisions of this Agreement earlier than five years from the Effective Date of the Agreement, and has maintained sustained compliance for at least one year, then the parties may file a joint motion to dismiss with the Court.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain sustained compliance. At the same time, temporary compliance during a period

41

of otherwise sustained noncompliance, shall not
constitute sustained compliance.

**SO ORDERED this _____ day of _____, 2007.**

_____

**United States District Court**

42

AGREED TO BY THE UNDERSIGNED:

Dated this _____10th_____ day of _____May_____, 2007.

FOR THE UNITED STATES:

_____

WAN J. KIM
Assistant Attorney General
Civil Rights Division


_____
SHANETTA Y. CUTLAR
Chief
Special Litigation Section


_____
JUDY PRESTON
Deputy Chief
Special Litigation Section


_____
JE YON JUNG
WILLIAM MADDOX
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-6251
(202) 514-6903 (fax)

43

FOR THE DISTRICT:


LINDA SINGER
Attorney General
For the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


*Ellen A. Efros (by JGP with permission)*

ELLEN A. EFROS [250746]
Chief, Equity I Section
Office of the Attorney General
441 4th Street, N.W.
6th Floor
Washington, D.C. 20001
(202) 442-9886