# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE DISTRICT OF COLUMBIA, et al.,**<br><br>**Defendants.** | **Civ. Action No.  07-0889 (TFH)** |

## ORDER FOR ENTRY OF SETTLEMENT AGREEMENT

The plaintiff, United States of America, and the defendants, District of Columbia, et al., have determined that a Settlement Agreement, rather than contested litigation, represents a fair, adequate and reasonable resolution to this lawsuit.  Accordingly, having carefully considered the parties' Joint Motion for Entry of Settlement Agreement, having received no opposition thereto from any interested party, and having found that the Settlement Agreement represents a fair, adequate and reasonable resolution to this lawsuit, it hereby is **ORDERED** that the motion is **GRANTED** pursuant to the terms and conditions of the Settlement Agreement.  Furthermore, this Court will continue to retain jurisdiction over the case in accordance with the terms of the Settlement Agreement.

**SO ORDERED.**

June 25th, 2007

_____
Thomas F. Hogan
Chief Judge

FILED

JUN 2 5 2007

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-889 |
| | ) | |
| THE DISTRICT OF COLUMBIA, | ) | |
| Honorable Adrian M. Fenty, | ) | |
| Mayor, District of Columbia, | ) | |
| in his official capacity only; | ) | |
| DEPARTMENT OF MENTAL HEALTH, | ) | |
| Stephen T. Baron, Director, | ) | |
| Department of Mental Health, | ) | |
| in his official capacity only; | ) | |
| and SAINT ELIZABETHS HOSPITAL, | ) | |
| Patrick J. Canavan, | ) | |
| Chief Executive Officer, | ) | |
| Saint Elizabeths Hospital, | ) | |
| in his official capacity only, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

SETTLEMENT AGREEMENT

# TABLE OF CONTENTS

I. General Provisions ......................................... 3

II. Definitions .............................................. 4

III. Compliance Officer ...................................... 5

IV. General Introduction ..................................... 6

V. Integrated Treatment Planning ............................. 7

VI. Mental Health Assessments ............................... 12

VII. Discharge Planning and Community Integration ............ 17

VIII. Specific Treatment Services ........................... 19

      A. Psychiatric Care ...................................... 19
      B. Psychological Care .................................... 22
      C. Pharmacy Services ..................................... 25
      D. Nursing and Unit-Based Services ....................... 25

IX. Documentation ........................................... 27

X. Restraints, Seclusion, and Emergency Involuntary
    Psychotropic Medications ................................. 28

XI. Protection From Harm .................................... 31

XII. Incident Management ..................................... 31

XIII. Quality Improvement .................................... 35

XIV. Environmental Conditions ............................... 36

XV. Benchmarks............................................... 37

XVI. Terms and Conditions ................................... 38

## I.   GENERAL PROVISIONS

A.   This Settlement Agreement(the "Agreement") is entered into between the United States and the District of Columbia; the District of Columbia Department of Mental Health; and Saint Elizabeths Hospital (collectively referred to as "the District").

B.   The Agreement resolves the investigation conducted by the United States Department of Justice ("United States") at Saint Elizabeths Hospital ("SEH") pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. The Agreement addresses the corrective measures set forth by the United States in its letter to the District dated May 23, 2006 ("Findings Letter"). This Agreement does not serve as an admission by the District that corrective measures are necessary to meet the constitutional and statutory rights of the residents of SEH.

C.   In conformity with CRIPA, this Agreement represents a voluntary effort by the District to meet the concerns raised by the United States' investigation. See 42 U.S.C. § 1997b (a)(2)(B) and § 1997g.

D.   Nothing in this Agreement shall be construed as an acknowledgment, an admission, or evidence of liability of the District under CRIPA, the Constitution, or federal or District law, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

E.   The signatures below of officials representing the United States and the District signify that these parties have given their final approval to this Agreement.

F.   This Agreement is enforceable only by the parties or the Court. This Agreement is binding upon the parties, by and through their officials, agents, employees, and successors. No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and,

4

accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement in any civil, criminal, or administrative action. Similarly, this Agreement does not authorize, nor shall it be construed to authorize, access to District documents by persons or entities not a party to this Agreement.

G.   Since the United States issued the May 23, 2006 Findings Letter, the District has made progress in remedying the problems the United States identified in the Findings Letter. The parties agree that it is in their mutual interests to avoid all litigation concerning the care and conditions of patients at SEH. The parties further agree that resolution of this matter pursuant to this Agreement is in the best interests of SEH's residents.

H.   All parties shall bear their own costs, including attorneys' fees, in this and any subsequent proceeding.

## II.   DEFINITIONS

A.   Effective Date

The Effective Date of this Agreement shall be the date that a corresponding order is entered by the District Judge for the United States District Court for the District of Columbia. Unless otherwise specified, each provision of this Decree shall be implemented within one year of the Effective Date.

B.   Saint Elizabeths Hospital

SEH consists of all current buildings and facilities and any buildings and facilities constructed, renovated, and/or designated as part of SEH in the future.

5

C.    Incident

> As required under Section XII of this Agreement, SEH
> will identify categories and definitions of incidents
> to be reported and investigated, and such categories
> and definitions shall include, but not be limited to,
> death, abuse, neglect, and serious injury.

## III. COMPLIANCE OFFICER

The District shall select, subject to the United States'
approval, a Compliance Officer to promote compliance with
and implementation of the provisions of this Settlement
Agreement.  The District shall pay the salary, costs, and
expenses associated with the Compliance Officer and, if
needed, shall provide sufficient funds to permit the
Compliance Officer to hire staff and consultants to assist
in carrying out the Compliance Officer's duties and
responsibilities under the Agreement.

The Compliance Officer shall serve as the liaison between
Saint Elizabeths Hospital, the District of Columbia, the
Department of Mental Health, and the United States
Department of Justice regarding compliance with this
Settlement Agreement.  The Compliance Officer's exclusive
duties are to oversee and promote implementation of the
provisions of the Agreement.

Specifically, the Compliance Officer's duties shall
include, but not be limited to:

1.    Monitoring and facilitating the District's compliance
      with each of the provisions in this Agreement;

2.    Preparing semi-annual reports for the parties
      regarding compliance with each of the provisions of
      the Agreement;

3.    Facilitating the organizing of and conducting formal
      meetings between the parties on a regular and periodic
      basis, at least quarterly, to update the parties
      regarding compliance with the Agreement, including
      areas of improvement and areas of concern; and

4.  Providing to the parties any relevant information known, or available to the Compliance Officer, under any provision of the Agreement upon reasonable request.

The Compliance Officer shall not be prohibited from conducting ex parte communications with the Department of Justice, Civil Rights Division, regarding any matter related to this Agreement.

## IV.  GENERAL INTRODUCTION

A.  Care and treatment provided by SEH shall fully comply with the requirements of federal law, the United States Constitution, and consistent with generally accepted professional standards of care for the care and treatment of institutionalized persons and shall be designed to:

1.  strengthen and support individuals' rehabilitation and recovery; and

2.  enable individuals to grow and develop in ways benefiting their health and well-being.

B.  Care and treatment shall be accomplished while making efforts to maximize individuals' safety, security, and freedom from undue bodily restraint.  Staff interactions with individuals shall be therapeutic and respectful.

C.  Each individual served by SEH shall be encouraged to participate in identifying his or her treatment goals and in selecting appropriate treatment options.  Care and treatment shall be designed to address each individual's psychiatric treatment needs and to assist each individual in meeting his or her specific treatment goals, consistent with generally accepted professional standards of care.  SEH shall ensure clinical and administrative oversight of, education of, and support to, its staff in planning and providing care and treatment consistent with these standards.

7

**V.    INTEGRATED TREATMENT PLANNING**

By 36 months from the Effective Date hereof, SEH shall provide integrated individualized services, and treatments (collectively "treatment") for the individuals it serves. SEH shall establish and implement standards, policies, and protocols and/or practices to provide that treatment determinations are coordinated by an interdisciplinary team through treatment planning and embodied in a single, integrated plan.

A.    Interdisciplinary Teams

By 36 months from the Effective Date hereof, each interdisciplinary team's membership shall be dictated by the particular needs of the individual in the team's care, and, at a minimum, the interdisciplinary team for each individual shall:

1.    Have as its primary objective the provision of individualized, integrated treatment and be designed to discharge or outplace the individual from SEH into the most appropriate, most integrated setting without additional disability;

2.    be led by a treating psychiatrist or licensed clinical psychologist who, at a minimum, shall:

a.    assume primary responsibility for the individual's treatment;

b.    require that the patient and, with the patient's permission, family or supportive community members are active members of the treatment team;

c.    require that each member of the team participates in assessing the individual on an ongoing basis and in developing, monitoring, and, as necessary, revising treatments;

       d.    require that the treatment team functions in an interdisciplinary fashion;

       e.    verify, in a documented manner, that psychiatric and behavioral treatments are properly integrated; and

       f.    require that the scheduling and coordination of assessments and team meetings, the drafting of integrated treatment plans, and the scheduling and coordination of necessary progress reviews occur.

3.    provide training on the development and implementation of interdisciplinary treatment plans, including the skills needed in the development of clinical formulations, needs, goals, interventions, discharge criteria, and all other requirements of section V.B., infra;

4.    consist of a stable core of members, including the resident, the treatment team leader, the treating psychiatrist, the nurse, and the social worker and, as the core team determines is clinically appropriate, other team members, who may include the patient's family, guardian, advocates, clinical psychologist, pharmacist, and other clinical staff; and

5.    meet every 30 days, during the first 60 days; thereafter every 60 days; and more frequently as clinically determined by the team leader.

B.    Integrated Treatment Plans

By 36 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols regarding the development of treatment plans to provide that:

1.    where possible, individuals have input into their treatment plans;

9

2.    treatment planning provides timely attention to
      the needs of each individual, in particular:

      a.    initial assessments are completed within 24
            hours of admission;

      b.    initial treatment plans are completed within
            5 days of admission; and

      c.    treatment plan updates are performed
            consistent with treatment plan meetings.

3.    individuals are informed of the purposes and
      major side effects of medication;

4.    each treatment plan specifically identifies the
      therapeutic means by which the treatment goals
      for the particular individual shall be addressed,
      monitored, reported, and documented;

5.    the medical director timely reviews high-risk
      situations, such as individuals requiring
      repeated use of seclusion and restraints;

6.    mechanisms are developed and implemented to
      ensure that all individuals adjudicated Not
      Guilty by Reason of Insanity ("NGRI") receive
      ongoing, timely, and adequate assessments by the
      treatment team to enable the courts to review
      effectively modifications in the individual's
      legal status;

7.    treatment and medication regimens are modified,
      as appropriate, considering factors such as the
      individual's response to treatment, significant
      developments in the individual's condition, and
      the individual's changing needs;

8.    an inter-unit transfer procedure is developed and
      implemented that specifies the format and content
      requirements of transfer assessments, including
      the mission of all units in the hospital; and

9.    to ensure compliance, a monitoring instrument is
      developed  to review the quality and timeliness
      of all assessments according to established
      indicators, including an evaluation of initial
      evaluations, progress notes, and transfer and
      discharge summaries, and a review by the
      physician peer review systems to address the
      process and content of assessments and
      reassessments, identify individual and group
      trends, and provide corrective follow-up action.
      This requirement specifically recognizes that
      peer review is not required for every patient
      chart.

C.   By 24 months from the Effective Date hereof, SEH shall
     establish policies and/or protocols to provide that
     treatment planning is based on case formulation for
     each individual based upon an integration of the
     discipline-specific assessments of the individual.
     Specifically, the case formulation shall:

     1.    be derived from analyses of the information
           gathered including diagnosis and differential
           diagnosis;

     2.    include a review of clinical history,
           predisposing, precipitating, and perpetuating
           factors, present status, and previous treatment
           history;

     3.    include a psychopharmacological plan of care that
           includes information on purpose of treatment,
           type of medication, rationale for its use, target
           behaviors, possible side effects, and targeted
           review dates to reassess the diagnosis and
           treatment in those cases where individuals fail
           to respond to repeated drug trials;

     4.    consider biochemical and psychosocial factors for
           each category in Section V.C.2., supra;

     5.    consider such factors as age, gender, culture,
           treatment adherence, and medication issues that

may affect the outcomes of treatment
interventions;

6.    enable the treatment team to reach determinations
about each individual's treatment needs; and

7.    make preliminary determinations as to the setting
to which the individual should be discharged, and
the changes that will be necessary to achieve
discharge whenever possible.

D.    By 24 months from the Effective Date hereof, SEH shall
establish policies and/or protocols to provide that
treatment planning is driven by individualized
factors.  Specifically, the treatment team shall:

1.    develop and prioritize reasonable and attainable
goals/objectives (i.e., relevant to each
individual's level of functioning) that build on
the individual's strengths and address the
individual's identified needs;

2.    provide that the goals/objectives address
treatment (e.g., for a disease or disorder) and
rehabilitation (e.g., skills/supports/quality of
life activities);

3.    write the objectives in behavioral and measurable
terms;

4.    provide that there are interventions that relate
to each objective, specifying who will do what
and within what time frame, to assist the
individual to meet his/her goals as specified in
the objective;

5.    design a program of interventions throughout the
individual's day with a minimum of 20 hours of
clinically appropriate treatment/rehabilitation
per week; and

6.    provide that each treatment plan integrates and
coordinates all selected services, supports, and
treatments provided by or through SEH for the

individual in a manner specifically responsive to the plan's treatment and rehabilitative goals.

E.  By 24 months from the Effective Date hereof, SEH shall develop or revise treatment plans, as appropriate, to provide that planning is outcome-driven and based on the individual's progress, or lack thereof.  The treatment team shall:

1.  revise the objectives, as appropriate, to reflect the individual's changing needs;

2.  monitor, at least monthly, the goals, objectives, and interventions identified in the plan for effectiveness in producing the desired outcomes;

3.  review the goals, objectives, and interventions more frequently than monthly if there are clinically relevant changes in the individual's functional status or risk factors;

4.  provide that the review process includes an assessment of progress related to discharge; and

5.  base progress reviews and revision recommendations on clinical observations and data collected.

## VI.  MENTAL HEALTH ASSESSMENTS

By 18 months from the Effective Date hereof, SEH shall ensure that each individual shall receive, after admission to SEH, an assessment of the conditions responsible for the individual's admission.  To the degree possible given the obtainable information, the individual's treatment team shall be responsible, to the extent possible, for obtaining information concerning the past and present medical, nursing, psychiatric, and psychosocial factors bearing on the individual's condition, and, when necessary, for revising assessments and treatment plans in accordance with newly discovered information.

13

A.    Psychiatric Assessments and Diagnoses

    1.    By 24 months from the Effective date hereof, SEH shall develop and implement policies and procedures regarding the timeliness and content of initial psychiatric assessments and ongoing reassessments, including a plan of care that outlines specific strategies, with rationales, adjustments of medication regimens, if appropriate, and initiation of specific treatment interventions;

    2.    By 24 months from the Effective Date hereof, SEH shall develop an admission risk assessment procedure, with special precautions noted where relevant, that includes available information on the categories of risk (e.g., suicide, self-injurious behavior, violence, elopements, sexually predatory behavior, wandering, falls, etc.); whether the risk is recent and its degree and relevance to dangerousness; the reason hospital care is needed; and any mitigating factors and their relation to current risk;

    3.    By 12 months from the Effective Date hereof, SEH shall use the most current Diagnostics and Statistics Manual ("DSM") for reaching psychiatric diagnoses;

    4.    By 18 months from the Effective Date hereof, SEH shall ensure that psychiatric assessments are consistent with SEH's standard diagnostic protocols;

    5.    By 12 months from the Effective Date hereof, SEH shall ensure that, within 24 hours of an individual's admission to SEH, the individual receives an initial psychiatric assessment, consistent with SEH's protocols;

    6.    By 12 months from the Effective Date hereof, SEH shall ensure that:

a.   clinically supported, and current
     assessments and diagnoses are provided for
     each individual;

b.   all physician trainees completing
     psychiatric assessments are supervised by
     the attending psychiatrist.  In all cases,
     the psychiatrist must review the content of
     these assessments and write a note to
     accompany these assessments;

c.   differential diagnoses, "rule-out"
     diagnoses, and diagnoses listed as "NOS"
     ("Not Otherwise Specified") are addressed
     (with the recognition that NOS diagnosis may
     be appropriate in certain cases where they
     may not need to be justified after initial
     diagnosis); and

d.   each individual's psychiatric assessments,
     diagnoses, and medications are clinically
     justified.

7.   By 24 months from the Effective Date hereof, SEH
     shall develop protocols to ensure an ongoing and
     timely reassessment of the psychiatric and
     biopsychosocial causes of the individual's
     continued hospitalization.

B.   Psychological Assessments (these assessments may be
     completed by psychologists or graduate students in
     psychology under the supervision of psychologists.)

     1.   By 24 months from the Effective Date hereof, SEH
          shall ensure that individuals referred for
          psychological assessment receive that assessment.
          These assessments may include diagnostic
          neuropsychological assessments, cognitive
          assessments, risk assessments and
          personality/differential diagnosis assessments,
          rehabilitation and habilitation interventions,
          behavioral assessments (including functional
          analysis of behavior in all settings), and
          personality assessments.

2. By 24 months from the Effective Date hereof, all psychological assessments, shall:

   a. expressly state the purpose(s) for which they are performed;

   b. be based on current, and accurate data;

   c. provide current assessment of risk for harm factors, if requested;

   d. include determinations specifically addressing the purpose(s) of the assessment; and

   e. include a summary of the empirical basis for all conclusions, where possible.

3. By 24 months from the Effective Date hereof, previously completed psychological assessments of individuals currently at SEH shall be reviewed by qualified clinicians and, if indicated, referred for additional psychological assessment.

4. By 24 months from the Effective Date hereof, appropriate psychological assessments shall be provided, whenever clinically determined by the team.

5. By 24 months from the Effective Date hereof, when an assessment is completed, SEH shall ensure that treating mental health clinicians communicate and interpret psychological assessment results to the treatment teams, along with the implications of those results for diagnosis and treatment.

C.    Rehabilitation Assessments

    1.    When requested by the treatment team leader, or otherwise requested by the treatment team, SEH shall perform a rehabilitation assessment, consistent with the requirements of this Settlement Agreement.  Any decision not to require a rehabilitation assessment shall be documented in the individual's record and contain a brief description of the reason(s) for the decision.

    2.    By 24 months from the Effective Date hereof, all rehabilitation assessments shall:

        a.    be accurate as to the individual's functional abilities;

        b.    identify the individual's life skills prior to, and over the course of, the mental illness or disorder;

        c.    identify the individual's observed and, separately, expressed interests, activities, and functional strengths and weaknesses; and

        d.    provide specific strategies to engage the individual in appropriate activities that he or she views as personally meaningful and productive.

    3.    By 24 months from the Effective Date hereof, rehabilitation assessments of all individuals currently residing at SEH who were admitted there before the Effective Date hereof shall be reviewed by qualified clinicians and, if indicated, referred for an updated rehabilitation assessment.

D.    Social History Assessments

By 18 months from the Effective Date hereof, SEH shall ensure that each individual has a social history evaluation that is consistent with generally accepted

professional standards of care.  This includes
identifying factual inconsistencies among sources,
resolving or attempting to resolve inconsistencies,
explaining the rationale for the resolution offered,
and reliably informing the individual's treatment team
about the individual's relevant social factors.

## VII. DISCHARGE PLANNING AND COMMUNITY INTEGRATION

Taking into account the limitations of court-imposed
confinement and public safety, SEH, in coordination and
conjunction with the District of Columbia Department of
Mental Health ("DMH") shall pursue the appropriate
discharge of individuals to the most integrated,
appropriate setting consistent with each person's needs and
to which they can be reasonably accommodated, taking into
account the resources available to the District and the
needs of others with mental disabilities.

A.  By 12 months from the Effective Date hereof, SEH, in
conjunction and coordination with DMH, shall identify
at admission and consider in treatment planning the
particular factors for each individual bearing on
discharge, including:

1.  those factors that likely would result in
successful discharge, including the individual's
strengths, preferences, and personal goals;

2.  the individual's symptoms of mental illness or
psychiatric distress;

3.  barriers preventing the specific individual from
being discharged to a more integrated
environment, especially difficulties raised in
previous unsuccessful placements, to the extent
that they are known; and

4.  the skills necessary to live in a setting in
which the individual may be placed.

B.  By 12 months from the Effective Date hereof, SEH shall
provide the opportunity, beginning at the time of
admission and continuously throughout the individual's

stay, for the individual to be a participant in the discharge planning process, as appropriate.

C.  By 12 months from the Effective Date hereof, SEH shall ensure that each individual has a discharge plan that is a fundamental component of the individual's treatment plan and that includes:

1.  measurable interventions regarding his or her particular discharge considerations;

2.  the persons responsible for accomplishing the interventions; and

3.  the time frames for completion of the interventions.

D.  By 12 months from the Effective Date hereof when clinically indicated, SEH and/or DMH shall transition individuals into the community where feasible in accordance with the above considerations.  In particular, SEH and/or DMH shall ensure that individuals receive adequate assistance in transitioning prior to discharge.

E.  Discharge planning shall not be concluded without the referral of an individual to an appropriate set of supports and services, the conveyance of information necessary for discharge, the acceptance of the individual for the services, and the discharge of the individual.

F.  By 12 months from the Effective Date hereof, SEH and/or DMH shall develop and implement a quality assurance/improvement system to monitor the discharge process and aftercare services, including:

1.  developing a system of follow-up with community placements to determine if discharged individuals are receiving the care that was prescribed for them at discharge; and

2.  hiring sufficient staff to implement these provisions with respect to discharge planning.

## VIII. SPECIFIC TREATMENT SERVICES

A.   Psychiatric Care

By 24 months from the Effective Date hereof, SEH shall provide all of the individuals it serves routine and emergency psychiatric and mental health services.

1.   By 24 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols regarding the provision of psychiatric care.  In particular, policies and/or protocols shall address physician practices regarding:

a.   documentation of psychiatric assessments and ongoing reassessments per the requirements of this Settlement Agreement;

b.   documentation of significant developments in the individual's clinical status and of appropriate psychiatric follow up;

c.   timely and justifiable updates of diagnosis and treatment, as clinically appropriate;

d.   documentation of analyses of risks and benefits of chosen treatment interventions;

e.   assessment of, and attention to, high-risk behaviors (e.g., assaults, self-harm, falls) including appropriate and timely monitoring of individuals and interventions to reduce risks;

f.   documentation of, and responses to, side effects of prescribed medications;

g.   documentation of reasons for complex pharmacological treatment; and

h.   timely review of the use of "pro re nata" or "as-needed" ("PRN") medications and

adjustment of regular treatment, as indicated, based on such use.

2.  By 18 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols to ensure system-wide monitoring of the safety, effectiveness, and appropriateness of all psychotropic medication use.  In particular, policies and/or protocols shall address:

    a.  monitoring of the use of psychotropic medications to ensure that they are:

        i.   clinically justified;

        ii.  prescribed in therapeutic amounts, and dictated by the needs of the individual;

        iii. tailored to each individual's clinical needs and symptoms;

        iv.  meeting the objectives of the individual's treatment plan;

        v.   evaluated for side effects; and

        vi.  documented.

    b.  monitoring mechanisms regarding medication use throughout the facility.  In this regard, SEH shall:

        i.   develop, implement and update, as needed, a complete set of medication guidelines that address the medical benefits, risks, and laboratory studies needed for use of classes of medications in the formulary;

        ii.  develop and implement a procedure governing the use of PRN medications that includes requirements for specific identification of the behaviors that

result in PRN administration of medications, a time limit on PRN uses, documented rationale for the use of more than one medication on a PRN basis, and physician documentation to ensure timely critical review of the individual's response to PRN treatments and reevaluation of regular treatments as a result of PRN uses;

iii.  establish a system for the pharmacist to communicate drug alerts to the medical staff; and

iv.  provide information derived from Adverse Drug Reactions, Drug Utilization Evaluations, and Medication Variance Reports to the Pharmacy and Therapeutics, Therapeutics Review, and Mortality and Morbidity Committees.

3.  By 36 months from the Effective Date hereof, SEH shall provide adequate levels of psychiatric staffing to ensure coverage by a full-time psychiatrist for not more than 12 individuals on the acute care units and no more than 24 individuals on the long-term units.

4.  SEH shall ensure that individuals in need are provided with behavioral interventions and plans with proper integration of psychiatric and behavioral modalities.  In this regard, SEH shall:

a.  ensure that psychiatrists review all proposed behavioral plans to determine that they are compatible with psychiatric formulations of the case;

b.  ensure regular exchanges of data between the psychiatrist and the psychologist; and

c.  integrate psychiatric and behavioral treatments.

5.    By 24 months from the Effective Date hereof, SEH shall review and ensure the appropriateness of the medication treatment.

6.    By 24 months from the Effective Date hereof, SEH shall ensure that individuals are screened and evaluated for substance abuse.

7.    By 24 months from the Effective Date hereof, SEH shall institute an appropriate system for the monitoring of individuals at risk for Tardive Dyskinesia ("TD").  SEH shall ensure that the psychiatrists integrate the results of these ratings in their assessments of the risks and benefits of drug treatments.

B.   Psychological Care

By 18 months from the Effective Date hereof, SEH shall provide adequate and appropriate psychological supports and services to individuals who require such services.

1.    By 18 months from the Effective Date hereof, SEH shall provide psychological supports and services adequate to treat the functional and behavioral needs of an individual including adequate behavioral plans and individual and group therapy appropriate to the demonstrated needs of the individual.  More particularly, SEH shall:

a.    ensure that psychologists adequately screen individuals for appropriateness of individualized behavior plans, particularly individuals who are subjected to frequent restrictive measures, individuals with a history of aggression and self-harm, treatment refractory individuals, and individuals on multiple medications;

b.    ensure that behavior plans contain a description of the maladaptive behavior, a functional analysis of the maladaptive

behavior and competitive adaptive behavior that is to replace the maladaptive behavior, documentation of which reinforcers for the individual were chosen and what input the individual had in their development, and the system for earning reinforcement;

c.    ensure that behavioral interventions are the least restrictive alternative and are based on appropriate, positive behavioral supports, not the use of aversive contingencies;

d.    ensure that psychologists adequately screen individuals for appropriateness of individualized behavior plans, particularly individuals who are subjected to frequent restrictive measures, individuals with a history of aggression and self-harm, treatment refractory individuals, and individuals on multiple medications;

e.    ensure that psychosocial, rehabilitative, and behavioral interventions are monitored appropriately and implemented appropriately; and

f.    ensure an adequate number of psychologists for each unit, where needed, with experience in behavior management, to provide adequate assessments and behavioral treatment programs.

2.    By 18 months from the Effective Date hereof, SEH shall provide adequate clinical oversight to therapy groups to ensure that individuals are assigned to groups that are appropriate to their individual needs.

3.    By 18 months from the Effective Date hereof, SEH shall provide adequate active psychosocial rehabilitation sufficient to permit discharge from SEH into the most integrated, appropriate setting available.

4.  By 18 months from the Effective Date hereof, SEH
    shall ensure that:

    a.  behavioral interventions are based on
        positive reinforcements rather than the use
        of aversive contingencies, to the extent
        possible;

    b.  programs are developed and implemented for
        individuals suffering from both substance
        abuse and mental illness problems;

    c.  where appropriate, a community living plan
        is developed and implemented for individuals
        with cognitive impairment;

    d.  programs are developed and implemented for
        individuals with forensic status recognizing
        the role of the courts in the type and
        length of the commitment and monitoring of
        treatment;

    e.  psychosocial, rehabilitative, and behavioral
        interventions are monitored and revised as
        appropriate in light of significant
        developments, and the individual's progress,
        or the lack thereof;

    f.  clinically relevant information remains
        readily accessible; and

    g.  staff who have a role in implementing
        individual behavioral programs have received
        competency-based training on implementing
        the specific behavioral programs for which
        they are responsible, and quality assurance
        measures are in place for monitoring
        behavioral treatment interventions.

C.    Pharmacy Services

By 36 months from the Effective Date hereof, SEH shall provide adequate and appropriate pharmacy services consistent with generally accepted professional standards of care.  By 36 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols that require:

1.    pharmacists to complete reviews of each individual's medication regimen regularly, on at least a monthly basis, and, as appropriate, make recommendations to treatment teams about possible drug-to-drug interactions, side effects, medication changes, and needs for laboratory work and testing; and

2.    physicians to consider pharmacists' recommendations and clearly document their responses and actions taken.

D.    Nursing and Unit-based Services

SEH shall within 24 months provide nursing services that shall result in SEH's residents receiving individualized services, supports, and therapeutic interventions, consistent with their treatment plans. More particularly, SEH shall:

1.    Ensure that, before they work directly with individuals, all nursing and unit-based staff have completed successfully competency-based training regarding mental health diagnoses, related symptoms, psychotropic medications, identification of side effects of psychotropic medications, monitoring of symptoms and target variables, and documenting and reporting of the individuals' status;

2.    Ensure that nursing staff monitor, document, and report accurately and routinely individual's symptoms, actively participate in the treatment team process and provide feedback on individual's

responses, or lack thereof, to medication and behavioral interventions;

3. Ensure that nursing staff monitor, document, and report routine vital signs and other medically necessary measurements (i.e., hydration, blood pressure, bowel sounds and movements, pulse, temperature, etc.), including particular attention to individuals returning from hospital and/or emergency room visits;

4. Ensure that nursing staff document properly and monitor accurately the administration of medications;

5. Ensure that, prior to assuming their duties and on a regular basis thereafter, all staff responsible for the administration of medication have completed successfully competency-based training on the completion of the Medication Administration Records;

6. Ensure that all failures to properly sign the Medication Administration Record are treated as medication errors, and that appropriate follow-up occurs to prevent recurrence of such errors;

7. Ensure that staff responsible for medication administration regularly ask individuals about side effects they may be experiencing and document responses;

8. Ensure that staff monitor, document, and report the status of symptoms and target variables in a manner enabling treatment teams to assess individuals' status and to modify, as appropriate, the treatment plan;

9. Ensure that each individual's treatment plan identifies:

   a. the diagnoses, treatments, and interventions that nursing and other staff are to implement;

       b.   the related symptoms and target variables to be monitored by nursing and other unit staff; and

       c.   the frequency by which staff need to monitor such symptoms.

10.  Establish an effective infection control program to prevent the spread of infections or communicable diseases.  More specifically, SEH shall:

       a.   actively collect data with regard to infections and communicable diseases;

       b.   assess these data for trends;

       c.   initiate inquiries regarding problematic trends;

       d.   identify necessary corrective action;

       e.   monitor to ensure that appropriate remedies are achieved;

       f.   integrate this information into SEH's quality assurance review; and

       g.   ensure that nursing staff implement the infection control program.

11.  Ensure sufficient nursing staff to provide nursing care and services.

## IX.  DOCUMENTATION

By 24 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols setting forth clear standards regarding the content and timeliness of progress notes, transfer notes, and discharge notes, including, but not limited to, an expectation that such records include meaningful, accurate assessments of the

individual's progress relating to treatment plans and
treatment goals.

X.    **RESTRAINTS, SECLUSION, AND EMERGENCY INVOLUNTARY
      PSYCHOTROPIC MEDICATIONS**

By 12 months from the Effective Date hereof, SEH shall
ensure that restraints, seclusion, and emergency
involuntary psychotropic medications are used consistent
with federal law and the Constitution of the United States.

A.    By 12 months from the Effective Date hereof, SEH shall
      develop, revise, as appropriate, and implement
      policies and/or protocols regarding the use of
      seclusion, restraints, and emergency involuntary
      psychotropic medications that cover the following
      areas:

      1.    the range of restrictive alternatives available
            to staff and a clear definition of each and that
            the use of prone restraints, prone containment
            and/or prone transportation is expressly
            prohibited.

      2.    training in the management of the individual
            crisis cycle and the use of restrictive
            procedures; and

      3.    the use of side rails on beds, including a plan:

            a.    to minimize the use of side rails as
                  restraints in a systematic and gradual way
                  to ensure safety; and

            b.    to provide that individualized treatment
                  plans address the use of side rails for
                  those who need them, including
                  identification of the medical symptoms that
                  warrant the use of side rails and plans to
                  address the underlying causes of the medical
                  symptoms.

B.    By 12 months from the Effective Date hereof, and
      absent exigent circumstances (i.e., when an individual

poses an imminent risk of injury to self or others),
SEH shall ensure that restraints and seclusion:

1. are used after a hierarchy of less restrictive
   measures has been considered and documented;

2. are not used in the absence of, or as an
   alternative to, active treatment, as punishment,
   or for the convenience of staff;

3. are not used as part of a behavioral
   intervention; and

4. are terminated as soon as the individual is no
   longer an imminent danger to self or others.

C. By 12 months from the Effective Date hereof, SEH shall
ensure that a physician's order for seclusion or
restraint include:

1. the specific behaviors requiring the
   procedure;

2. the maximum duration of the order;

3. behavioral criteria for release which, if met,
   require the individual's release even if the
   maximum duration of the initiating order has not
   expired;

4. ensure that the individual's physician be
   promptly consulted regarding the restrictive
   intervention;

5. ensure that at least every 30 minutes,
   individuals in seclusion or restraint must be re-
   informed of the behavioral criteria for their
   release from the restrictive intervention;

6. ensure that immediately following an individual
   being placed in seclusion or restraint, there is
   a debriefing of the incident with the treatment
   team within one business day;

7.   comply with 42 C.F.R. Part 483, Subpart G, including assessments by a physician or licensed medical professional of any individual placed in seclusion or restraints; and

8.   ensure that any individual placed in seclusion or restraints is monitored by a staff person who has completed successfully competency-based training regarding implementation of seclusion and restraint policies and the use of less restrictive interventions.

D.   By 12 months from the Effective Date hereof, SEH shall ensure the accuracy of data regarding the use of restraints, seclusion, or emergency involuntary psychotropic medications.

E.   By 12 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement policies and/or protocols to require the review of, within three business days, individual treatment plans for any individuals placed in seclusion or restraints more than three times in any four-week period, and modification of treatment plans, as appropriate.

F.   By 12 months from the Effective Date hereof, SEH shall develop and implement policies and/or protocols regarding the use of emergency involuntary psychotropic medication for psychiatric purposes, requiring that:

1.   such medications are used on a time-limited, short-term basis and not as a substitute for adequate treatment of the underlying cause of the individual's distress;

2.   a physician assess the individual within one hour of the administration of the emergency involuntary psychotropic medication; and

3.   the individual's core treatment team conducts a review (within three business days) whenever three administrations of emergency involuntary psychotropic medication occur within a four-week

period, determines whether to modify the
individual's treatment plan, and implements the
revised plan, as appropriate.

G.   By 18 months from the Effective Date hereof, SEH shall
ensure that all staff whose responsibilities include
the implementation or assessment of seclusion,
restraints, or emergency involuntary psychotropic
medications successfully complete competency-based
training regarding implementation of all such policies
and the use of less restrictive interventions.

## XI.   PROTECTION FROM HARM

By 36 months from the Effective Date hereof, SEH shall
provide the individuals it serves with a safe and humane
environment, ensure that these individuals are protected
from harm, and otherwise adhere to a commitment to not
tolerate abuse or neglect of individuals, and require that
staff investigate and report abuse or neglect of
individuals in accordance with this Settlement Agreement
and with District of Columbia statutes governing abuse and
neglect.  SEH shall not tolerate any failure to report
abuse or neglect.  Furthermore, before permitting a staff
person to work directly with any individuals served by SEH,
the Human Resources office or officials responsible for
hiring shall investigate the criminal history and other
relevant background factors of that staff person, whether
full-time or part-time, temporary or permanent, or a person
who volunteers on a regular basis.  Facility staff shall
directly supervise volunteers for whom an investigation has
not been completed when they are working directly with
individuals living at the facility.

## XII.  INCIDENT MANAGEMENT

By 24 months from the Effective Date hereof, SEH shall
develop and implement, across all settings, an integrated
incident management system.  For purposes of this section,
"incident" means death, serious injury, potentially lethal
self harm, seclusion and restraint, abuse, neglect, and
elopement.

A.  By 24 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement comprehensive, consistent incident management policies, procedures and practices.  Such policies and/or protocols, procedures, and practices shall require:

   1.  identification of the categories and definitions of incidents to be reported and investigated, including seclusion and restraint and elopements;

   2.  immediate reporting by staff to supervisory personnel and SEH's chief executive officer (or that official's designee) of serious incidents; and the prompt reporting by staff of all other unusual incidents, using standardized reporting across all settings;

   3.  mechanisms to ensure that, when serious credible allegations of abuse, neglect, and/or serious injury occur, staff take immediate and appropriate action to protect the individuals involved, including removing alleged perpetrators from direct contact with individuals pending the investigation's outcome;

   4.  adequate training for all staff on recognizing and reporting incidents;

   5.  notification of all staff when commencing employment and adequate training thereafter of their obligation to report incidents to SEH and District officials;

   6.  posting in each unit a brief and easily understood statement of how to report incidents;

   7.  procedures for referring incidents, as appropriate, to law enforcement; and

   8.  mechanisms to ensure that any staff person, resident, family member, or visitor who, in good faith, reports an allegation of abuse or neglect is not subject to retaliatory action by SEH

and/or the District, including but not limited to reprimands, discipline, harassment, threats, or censure, except for appropriate counseling, reprimands, or discipline because of an employee's failure to report an incident in an appropriate or timely manner.

B.   By 24 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement policies and/or protocols addressing the investigation of serious incidents, including elopements, suicides and suicide attempts, and abuse and neglect.  Such policies and procedures shall:

    1.   require that such investigations be comprehensive, include consideration of staff's adherence to programmatic requirements, and be performed by independent investigators;

    2.   require all staff involved in conducting investigations to complete successfully competency-based training on technical and programmatic investigation methodologies and documentation requirements necessary in mental health service settings;

    3.   include a mechanism which will monitor the performance of staff charged with investigative responsibilities and provide technical assistance and training whenever necessary to ensure the thorough, competent, and timely completion of investigations of serious incidents; and

    4.   include a reliable system to identify the need for, and monitor the implementation of, appropriate corrective and preventative actions addressing problems identified as s result of investigations.

C.   By 24 months from the Effective Date hereof, whenever remedial or programmatic action is necessary to correct a reported incident or prevent re-occurrence, SEH shall implement such action promptly and track and document such actions and the corresponding outcomes.

34

D.   By 24 months from the Effective Date hereof, records
     of the results of every investigation of abuse,
     neglect, and serious injury shall be maintained in a
     manner that permits investigators and other
     appropriate personnel to easily access every
     investigation involving a particular staff member or
     resident.

E.   By 24 months from the Effective Date hereof, SEH shall
     have a system to allow the tracking and trending of
     incidents and results of actions taken.  Such a system
     shall:

     1.   Track trends by at least the following
          categories:

          a.   type of incident;

          b.   staff involved and staff present;

          c.   individuals involved and witnesses
               identified;

          d.   location of incident;

          e.   date and time of incident;

          f.   cause(s) of incident; and

          g.   actions taken.

     2.   Develop and implement thresholds for injury/event
          indicators, including seclusion and restraint,
          that will initiate review at both the
          unit/treatment team level and at the appropriate
          supervisory level, and that will be documented in
          the individual's medical record with explanations
          given for changing/not changing the individual's
          current treatment regimen.

     3.   Develop and implement policies and procedures on
          the close monitoring of individuals assessed to
          be at risk, including those at risk of suicide,

that clearly delineate:  who is responsible for such assessments, monitoring, and follow-up; the requisite obligations to consult with other staff and/or arrange for a second opinion; and how each step in the process should be documented in the individual's medical record.

## XIII.  QUALITY IMPROVEMENT

By 36 months from the Effective Date hereof, SEH shall develop, revise, as appropriate, and implement quality improvement mechanisms that provide for effective monitoring, reporting, and corrective action, where indicated, to include compliance with this Settlement Agreement.

A.   Track data, with sufficient particularity for actionable indicators and targets identified in this Agreement, to identify trends and outcomes being achieved.

B.   Analyze data regularly and, whenever appropriate, require the development and implementation of corrective action plans to address problems identified through the quality improvement process.  Such plans shall identify:

   1.   the action steps recommended to remedy and/or prevent the reoccurrence of problems;

   2.   the anticipated outcome of each step; and

   3.   the person(s) responsible and the time frame anticipated for each action step.

C.   Provide that corrective action plans are implemented and achieve the outcomes identified in the Agreement by:

   1.   disseminating corrective action plans to all persons responsible for their implementation;

   2.   monitoring and documenting the outcomes achieved; and

      3.    modifying corrective action plans, as necessary.

D.    Utilize, on an ongoing basis, appropriate performance improvement mechanisms to achieve SEH's quality/performance goals, including identified outcomes.

## XIV. ENVIRONMENTAL CONDITIONS

By 36 months of the Effective Date hereof, SEH shall develop and implement a system to regularly review all units and areas of the hospital to which residents have access to identify any potential environmental safety hazards and to develop and implement a plan to remedy any identified issues, including the following:

A.    By 36 months from the Effective Date hereof, SEH shall attempt to identify potential suicide hazards (e.g., seclusion rooms and bathrooms) and expediently correct them.

B.    By 36 months from the Effective Date hereof, SEH shall develop and implement policies and procedures consistent with generally accepted professional standards of care to provide for appropriate screening for contraband.

C.    By 24 months from the Effective Date hereof, SEH shall provide sufficient professional and direct care staff to adequately supervise individuals, particularly on the outdoor smoking porches, prevent elopements, and otherwise provide individuals with a safe environment and adequately protect them from harm.

D.    By 36 months from the Effective Date hereof, SEH shall ensure that the elevators are fully repaired. If possible, non-ambulatory individuals should be housed in first floor levels of living units. All elevators shall be inspected by the relevant local authorities.

E.    By 12 months from the Effective Date hereof, SEH shall review and update the hospital fire safety and

evacuation plan for all buildings and ensure that the plan is approved by the local fire authority.

F.   By 36 months from the Effective Date hereof, SEH shall develop and implement procedures to timely identify, remove and/or repair environmentally hazardous and unsanitary conditions in all living units and kitchen areas.

## XV.  BENCHMARKS

By December 31, 2007, the District agrees to make substantial improvement in the following four (4) areas of this Settlement Agreement listed below.  Every four months beginning with the Effective Date of this Agreement, the District shall submit to the United States a Corrective Action Plan ("CAP") to achieve substantial improvement. The CAP shall list the particular provision of the Agreement being addressed, the action steps to be taken to adequately comply with the provision, the timeline to achieve the action steps, the person(s) responsible for implementing the action steps, the status of the action steps along with quality assurance mechanisms to evaluate and monitor such status, and the documents that demonstrate progress and/or compliance with the particular provision. If the District fails to comply with the below benchmarks, the United States may assert all its remedies available under law.

A.   Integrated Treatment Planning and its provisions under Section V of the Agreement.

B.   Mental Health Assessments and its provisions under Section VI of the Agreement.

C.   Incident Management System and its provisions under Section XII of the Agreement.

D.   Restraints, Seclusion, and Emergency Involuntary Psychotropic Medications and its provisions under Section X of the Agreement.

38

## XVI.  TERMS AND CONDITIONS

A.   The District represents that it will periodically
     refine and revise the policies and/or protocols
     outlined in this Agreement to ensure compliance with
     the intent of this Agreement.  The District shall
     notify the United States regarding any substantive
     revisions to a policy and or protocol outlined under
     this Agreement.  Upon request by the United States,
     the District shall provide the United States with
     copies and an opportunity to provide substantive
     comment upon any policies and/or protocols revised
     pursuant to this Agreement.  If it wishes to provide
     substantive comments, the United States will provide
     such comments or request for additional time within 45
     days of receipt of the revisions.

B.   The District represents that it has educated, or will
     educate, all employees at SEH with respect to the
     policies and/or protocols outlined in this Agreement.

C.   The District shall maintain records to document its
     compliance with all terms and conditions of this
     Agreement.  The District shall also maintain any and
     all records required by, or developed pursuant to,
     this Agreement.

D.   Until this matter is dismissed, the United States
     shall have unrestricted access to, and shall, upon
     request, receive copies of any documents, records, and
     information relating to the implementation of this
     Agreement.  SEH shall provide any requested documents,
     records, and information to the United States as soon
     as possible, but no later than within 30 business days
     of the request.  The United States shall have
     reasonable access to all of SEH's buildings and
     facilities, including any newly constructed, renovated
     and/or designated buildings and facilities; staff and
     residents, including private interviews with staff,
     and, where clinically appropriate, private interviews
     with residents; and resident records, documentation,
     and information relating to the issues addressed in
     this Agreement.  SEH shall make all employees
     available so that they may choose to cooperate fully

with the United States.  The United States agrees to
provide SEH with reasonable notice of any visit or
inspection, although the United States and SEH agree
that no notice shall be required in an emergency
situation where the life, immediate health, or
immediate safety of individual(s) is at issue.
Nothing in this Agreement shall abridge ·the
whistleblower rights of District employees or
contractors under law.

E.  The District shall notify the DOJ immediately upon the
death of any SEH's patient (excluding those patients
on conditional release) and/or any situation resulting
in such patient being placed in imminent and/or
immediate jeopardy that has caused or may cause severe
injury to such SEH patient.  The District shall
forward to DOJ copies of any completed incident
reports related to deaths, autopsies and/or death
summaries of residents, as well as all final reports
of investigations of those incidents described in this
subsection.

F.  If SEH closes and individuals are moved to another
facility or facilities, the United States reserves the
right to evaluate the appropriateness of such
placements.  If the District contracts for any of the
services to be delivered at SEH which are covered
under this Agreement, the Agreement shall be fully
applicable to, and binding upon, any contracted
services.

G.  If the United States maintains that the District has
failed to carry out any requirement of this Agreement,
the United States shall notify the District of any
instance(s) in which it maintains that the District
has failed to carry out the requirements of this
Agreement.

H.  With the exception of conditions or practices that
pose an immediate and serious threat to the life,
health, or safety of a resident(s) at SEH, the
District shall take substantial steps to correct the
claim of non-compliance within 90 days of any notice
of non-compliance.  During this period, the United

States and the District shall coordinate and discuss
areas of disagreement and attempt to resolve
outstanding differences.  If the United States and the
District fail to reach an agreement, the United States
is not limited in any fashion in pursuing its law
enforcement obligations with 30 days notice, including
any adverse litigation against the District and/or
seeking appropriate enforcement of any provision of
this Agreement.

I.   The District shall submit to the United States a
     status report every 6 months that discusses the
     current status of each provision of the Settlement
     Agreement along with a projection of the completion
     date for each provision and steps needed to be taken
     achieve such completion date.

J.   If, at any time, any party to this Agreement desires
     to modify it for any reason, that party will notify
     the other party in writing of the proposed
     modification and the reasons therefor.  No
     modification will occur unless there is a written
     agreement between the United States and the District.
     The mutually agreed upon modification must be approved
     by the Court.

K.   The Court will have continuing jurisdiction over
     enforcement of this Agreement for a period of five
     years from the effective date hereof.  If the District
     is able to reach sustained compliance with certain
     Sections of the Agreement for a period of two years,
     the United States will no longer monitor or require
     evaluation of such Sections.  If the parties agree
     that the District is in sustained compliance with each
     of the provisions of this Agreement earlier than five
     years from the Effective Date of the Agreement, and
     has maintained sustained compliance for at least one
     year, then the parties may file a joint motion to
     dismiss with the Court.  Noncompliance with mere
     technicalities, or temporary failure to comply during
     a period of otherwise sustained compliance, shall not
     constitute failure to maintain sustained compliance.
     At the same time, temporary compliance during a period

of otherwise sustained noncompliance, shall not constitute sustained compliance.

SO ORDERED this _____ day of _____ , 2007.

_____
United States District Court

42

AGREED TO BY THE UNDERSIGNED:

Dated this _____ *10ᵗʰ* _____ day of _____ *May* _____, 2007.

FOR THE UNITED STATES:

_____
WAN J. KIM
Assistant Attorney General
Civil Rights Division


_____
SHANETTA Y. CUTLAR
Chief
Special Litigation Section


_____
JUDY PRESTON
Deputy Chief
Special Litigation Section


_____
JE YON JUNG
WILLIAM MADDOX
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC  20530
(202) 514-6251
(202) 514-6903 (fax)

43

FOR THE DISTRICT:


LINDA SINGER
Attorney General
For the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


*Ellen a. Efros (by JCP with permission)*
_____
ELLEN A. EFROS [250746]
Chief, Equity I Section
Office of the Attorney General
441 4th Street, N.W.
6th Floor
Washington, D.C. 20001
(202) 442-9886

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been

served by First-Class mail, postage prepaid to:

ELLEN A. EFROS
Chief, Equity 1 Section
Office of the Attorney General
441 4th Street, N.W.
6th Floor
Washington, D.C. 20001

on this ____ day of May, 2007.

LAURIE WEINSTEIN
Assistant United States Attorney
555 Fourth Street, N.W.,
Room E4820
Washington, D.C.  20001
(202) 514-7133